**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
Michael W. Sobol (SBN 194857)
msobol@lchb.com
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
Nicholas Diamand
ndiamand@lchb.com
Douglas I. Cuthbertson
dcuthbertson@lchb.com
Abbye R. Klamann (SBN 311112)
aklamann@lchb.com
250 Hudson Street, 8th Floor
New York, NY  10013-1413
Telephone:  212.355.9500
Facsimile:  212.355.9592

**CARNEY BATES & PULLIAM, PLLC**
Hank Bates (SBN 167688)
hbates@cbplaw.com
Allen Carney
acarney@cbplaw.com
David Slade
dslade@cbplaw.com
519 West 7th St.
Little Rock, AR 72201
Telephone:  501.312.8500
Facsimile:  501.312.8505

*Attorneys for Plaintiffs individually and on*
*behalf of all others similarly situated*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMANDA RUSHING, et al., <br><br> Plaintiffs, <br><br> v. <br><br> VIACOM INC., et al. <br><br> Defendants. | CASE NO. 3:17-CV-04492-JD <br><br> **PLAINTIFFS' OPPOSITION TO THE VIACOM DEFENDANTS' MOTION TO COMPEL ARBITRATION** <br><br> Judge:      Hon. James Donato <br> Date:       February 1, 2018 <br> Time:       10:00 a.m. <br> Courtroom:  11 |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. ii

II.   THE FACTUAL CIRCUMSTANCES SURROUNDING THE DOWNLOAD
      AND PLAY OF VIACOM'S *LLAMA SPIT SPIT* APP. .................................... 2

      A.   Downloading *Llama Spit Spit* ............................................................. 2

      B.   *Llama Spit Spit*'s start screen ............................................................ 3

III.  ARGUMENT ....................................................................................................... 4

      A.   Arbitration is a matter of contract, and no contract was entered into by the
           parties. .................................................................................................. 4

      B.   California contract law applies to the analysis of Viacom's EULA. ...................... 5

      C.   A browsewrap agreement is enforceable only when it is conspicuous and
           the user is on notice that continued use connotes acceptance of the terms. ............ 5

      D.   Users are not put on notice of Viacom's EULA when downloading *Llama
           Spit Spit*. .............................................................................................. 7

           1.   Viacom's EULA is inconspicuous and unavailable during the
                download process. ......................................................................... 8

           2.   Viacom does not provide users with sufficient, further notice of its
                EULA during download. ................................................................. 9

      E.   *Llama Spit Spit*  users were not put on notice of Viacom's EULA while
           playing the app. ..................................................................................... 10

           1.   Viacom's EULA is inconspicuous to children playing the app. .............. 10

           2.   Viacom does not provide users with sufficient, further notice of its
                EULA while playing the app.......................................................... 12

      F.   Viacom's cases address websites with conspicuous hyperlinks and
           additional textual notices, and therefore do not support its Motion...................... 12

      G.   Plaintiffs did not assent to Viacom's EULA........................................................ 13

      H.   There are no threshold questions for an arbitrator because there is no
           agreement to arbitrate................................................................................. 14

IV.   CONCLUSION ................................................................................................. 14

# TABLE OF AUTHORITIES

**Page**

## CASES

*AT&T Mobility LLC v. Concepcion*,
   131 S. Ct. 1740 (2011) ........................................................................................... 2, 4

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
   475 U.S. 643 (1986) ................................................................................................... 4

*Burgoon v. Narconon of N. Cal.*,
   125 F. Supp. 3d 974 (N.D. Cal. 2015) .................................................................... 14

*Cairo, Inc. v. Crossmedia Servs., Inc.*,
   No. 04–04825, 2005 WL 756610 (N.D. Cal. Apr. 1, 2005) ...................................... 6

*Comer v. Micor, Inc.*,
   436 F.3d 1098 (9th Cir. 2006) .................................................................................. 5

*DeVries v. Experian Info. Sols., Inc.*,
   No. 16-cv-02953-WHO, 2017 U.S. Dist. LEXIS 26471 (N.D. Cal. Feb. 24, 2017) ................ 12

*Doe v. Xytex Corp.*,
   No. C 16-02935 WHA, 2016 WL 3902577 (N.D. Cal. July 19, 2016) ...................... 7, 9, 10, 11

*First Options of Chic., Inc. v. Kaplan*,
   514 U.S. 938 (1995) ................................................................................................... 4

*Granite Rock Co. v. Int'l Brotherhood of Teamsters*,
   561 U.S. 287 (2010) ................................................................................................. 14

*Hoffman v. Citibank (South Dakota), N.A.*,
   546 F.3d 1078 (9th Cir. 2008) .................................................................................. 5

*In re Henson*,
   869 F.3d 1052 (9th Cir. 2017) ............................................................................... 4, 5

*Int'l Longshore  v. Columbia Grain, Inc.*,
   No. 15-35620, 2017 WL 4816767 (9th Cir. Oct. 25, 2017) ..................................... 14

*Knutson v. Sirius XM Radio Inc.*,
   771 F.3d 559 (9th Cir. 2014) .................................................................................... 4

*Kum Tat Ltd. v. Linden Ox Pasture, LLC*,
   No. 14-cv-02857-WHO, 2014 WL 6882421 (N.D. Cal. Dec. 5, 2014) .................... 14

*Long v. Provide Commerce, Inc.*,
   245 Cal. App. 4th 855 (2016) .............................................................................. 7, 10

*McKee v. Audible, Inc.*,
   No. CV 17-1941-GW(Ex), 2017 WL 4685039 (C.D. Cal. July 17, 2017) .................. 7, 8, 9, 11

**TABLE OF AUTHORITIES**
(continued)

Page

*Meyer v. Uber Techs., Inc.*,
  868 F.3d 66 (2d Cir. 2017) ..................................................................................... 12

*Mitchell v. U-Haul Co. of Cal.*,
  No. 16-cv-04674-JD, 2017 U.S. Dist. LEXIS 79064 (N.D. Cal. May 23, 2017) ............... 4, 7, 8

*Nevarez v. Forty Niners Football Co.*,
  No. 16-CV-07013, 2017 WL 3492110 (N.D. Cal. Aug. 15, 2017) .......................................... 12

*Nguyen v. Barnes & Noble Inc.*,
  763 F.3d 1171 (9th Cir. 2014) ......................................................................................... passim

*Norcia v. Samsung Telecomms. Am., LLC*,
  No. 14-cv-00582-JD, 2014 WL 4652332 (N.D. Cal. Sep. 18, 2014), *affirmed, Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279 (9th Cir. 2017) ................................... 5, 6, 8, 11

*Opperman v. Path, Inc.*,
  205 F. Supp. 3d 1064 (N.D. Cal. 2016) ............................................................................. 7, 9

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*,
  96 F.3d 1151 (9th Cir. 1996) ................................................................................................ 5

*Register.com, Inc. v. Verio, Inc.*,
  356 F.3d 393 (2d Cir. 2004) ................................................................................................ 12

*Specht v. Netscape Commc'ns Corp.*,
  306 F.3d 17 (2d Cir. 2002) ................................................................................................... 6

*Van Tassell v. United Mktg. Grp., Ltd. Liab. Co.*,
  795 F. Supp. 2d 770 (N.D. Ill. 2011) ................................................................................... 11

*Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*,
  489 U.S. 468 (1989) ............................................................................................................. 4

*Washington Mut. Bank, FA v. Super. Ct.*,
  24 Cal. 4th 906 (Cal. 2001) .................................................................................................. 5

*Windsor Mills, Inc. v. Collins & Aikman Corp.*,
  25 Cal. App. 3d 987 (1972) .................................................................................................. 6

1  **I.      INTRODUCTION**

2       Defendants Viacom Inc. and Viacom International Inc. (collectively, "Viacom") move to

3  compel arbitration of Plaintiffs' claims based on Viacom's unenforceable browsewrap agreement.

4  Viacom's motion should be denied.  Browsewrap agreements generally take the form of a simple

5  link to the app's terms and conditions, and do not require that app users take any affirmative

6  action to specifically view the link or otherwise assent to those terms.  Because browsewrap

7  agreements risk binding users to terms and conditions that they might never see and which might

8  fundamentally impact their rights, their enforceability is carefully scrutinized.  Under controlling

9  Ninth Circuit authority, browsewrap agreements are unenforceable without (1) a conspicuously

10  placed hyperlink that is not "buried" on the website (or app), and (2) an *additional*, conspicuous

11  textual notice that by performing some further action – for example, clicking a button or even

12  continuing to browse the website or app – the visitor is agreeing to be bound by the hyperlinked

13  terms.  *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014).  Viacom fails the *Nguyen*

14  test on *both* prongs—at no point during the download of *Llama Spit Spit*[1] or at the game's start

15  screen is a user presented with a conspicuous hyperlink *or* an additional notice directing one's

16  attention to such link.

17       Indeed, Plaintiffs Amanda Rushing and her daughter, L.L., never assented in any way to

18  Viacom's EULA, nor is such assent required in order either to download or to play the game at

19  issue, *Llama Spit Spit*.  Rather, users download and play the game without ever being apprised of

20  the EULA, much less agreeing to it.

---

21  [1] Viacom devotes portions of its Motion to discussing contract formation issues in Game
22  Tracking Apps beyond *Llama Spit Spit*.  (Motion of Defendants Viacom Inc. and Viacom
    International Inc. for Stay Pending Arbitration ("Motion" or "Mot"). at 5, 9-11, Dkt. 66; Ortiz
23  Decl. ¶¶ 9, 18-20.)  However, this misreads the allegations in the Complaint.  Beyond *Llama Spit
    Spit*, Plaintiffs did not download any of the Game Tracking Apps listed in the Complaint or
24  discussed by Viacom in its Motion.  (Class Action Complaint ("Compl.") ¶¶ 3, 69-73.)  Rather,
    Plaintiffs simply identified substantially similar Game Tracking Apps (*Id.* ¶ 35) containing the
25  same SDKs as *Llama Spit Spit* and exhibiting the same data-exfiltrating behavior (*Id.* ¶¶ 35-38).
    Therefore, the context of those apps is irrelevant to whether Plaintiffs entered into any agreement
26  to arbitrate this dispute.  Viacom recognizes this in the final footnote of its brief.  (Mot. at 14, n.
    9.)  Although Plaintiffs dispute Viacom's characterization of the circumstances surrounding the
27  download and play of those additional Game Tracking Apps, Plaintiffs will not address those
    disputes at this time since Plaintiffs never downloaded those apps and such circumstances are
28  therefore irrelevant to whether the parties entered into an agreement to arbitrate this dispute.

It is undisputed that arbitration is a matter of contract.  *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1745 (2011).  Because no valid agreement to arbitrate exists between the Parties, the Court should deny Viacom's Motion.  Similarly, because no agreement exists, the Parties did not confer any rights regarding the determination of scope or enforceability to an arbitrator, and thus all threshold issues are properly resolved by the Court rather than by a third-party arbitrator as Viacom demands.  Accordingly, Viacom's Motion should be denied in its entirety.

## II.   THE FACTUAL CIRCUMSTANCES SURROUNDING THE DOWNLOAD AND PLAY OF VIACOM'S *LLAMA SPIT SPIT* APP. [2]

Plaintiff Amanda Rushing downloaded Viacom's *Llama Spit Spit* app for her daughter, Plaintiff L.L., on March 25, 2017 via Apple's App Store.[3]  L.L. then played the game on an ongoing basis, ostensibly seeing the start screen described in the Declaration of Alex Ortiz ("Ortiz Decl.") (ECF No. 66-1 ¶ 17, figure 6) each time she played the game.  (Compl. ¶ 69.)  While playing *Llama Spit Spit*, L.L. had her personal data exfiltrated and used for profiling purposes via advertising SDKs installed in the app.  (*Id.* ¶ 70.)

### A.   Downloading *Llama Spit Spit*

Apple users can download *Llama Spit Spit* in the App Store, where a download page for the app shows multiple vibrantly-colored, cartoonish images from the game and contains the description: "The spit is on! Defeat hipster enemies as you collect coins, power-ups and crazy llama costumes.  Llama-tastic scores can land you on the leaderboard…**more**."  (Addendum,[4] Fig. 1; Ortiz Decl. ¶ 13, Fig. 3.)  The potential user is not presented with any notification regarding the availability of any terms of service governing the app.  If someone wishes to

---

[2] Plaintiffs respectfully refer the Court to their concurrently-filed Brief in Opposition to Defendants' Preemption Motion and incorporate the factual recitation regarding Defendants' illegal tracking of children and the nature of Plaintiffs' claims arising therefrom.

[3] Because Plaintiffs did not download *Llama Spit Spit* from the Google Play website, the characteristics of that webpage have no relevance to whether Plaintiffs entered into an agreement to arbitrate this dispute.  However, as Viacom notes, the circumstances surrounding the download and play of *Llama Spit Spit* are very similar in the Google context.

[4] For the Court's convenience, Plaintiffs have provided an Addendum attached to this brief, which contains images from the Ortiz Declaration that are referenced throughout.

1   download the game, she does so by clicking a large, blue button marked "GET" in the top-right of

2   the screen.  (*Id.*)  At no point must she click the "more" hyperlink in order to download the game.

3   However, if the user *were* to click the "more" hyperlink, additional text appears on the

4   download screen.  (Addendum, Fig. 2; Ortiz Decl. ¶ 13, Fig. 4.)  At the bottom of this new text

5   are several URLs, including one for an "End User License Agreement."  (*Id.*)  However, this

6   URL is not a functional hyperlink – it cannot be clicked on, nor can it be copied and pasted.

7   (Declaration of Michael Pollock ("Pollock Declaration" or "Pollock Decl.") ¶¶ 6-8, 10.)  In other

8   words, one cannot *read* or otherwise *access* the End User License Agreement from the Apple

9   Store download page, or at any point in the process of downloading the game.

10  **B.** *Llama Spit Spit***'s start screen**

11  When a child opens *Llama Spit Spit* to play the game, she is presented with an animated

12  start screen, in which the game's main character – a cartoon llama – caroms through space.

13  (Addendum, Fig. 3; Ortiz Decl. ¶ 17, fig. 6; Pollock Decl. ¶¶ 11-19.)  As demonstrated by the

14  Pollock Declaration and its accompanying videos, the child can immediately begin playing *Llama*

15  *Spit Spit* without clicking any of the various hyperlinks on the screen, and the child is not

16  presented with any notification of the existence of "terms of service."  (Pollock Decl. ¶¶ 11-19.)

17  Nor is there any indication that by continuing to play, the child is agreeing to an unreferenced set

18  of terms.  (*Id.*)  The initial screen does include a reference to a "Privacy Policy" in the bottom far-

19  left corner.  (Addendum, Fig. 3; Ortiz Decl. ¶ 17, fig. 6.)  If a child were to click on those words,

20  she would see a new screen containing four new hyperlinks, one of which is the "Privacy Policy"

21  and another the "EULA."  (Addendum, Fig. 4; Ortiz Decl. ¶ 17, fig. 7.)  This page—accessible

22  only if the child clicks the link labeled "Privacy Policy"—does not include any reference to

23  "terms of service" or an "end user license agreement," but contains only the vague "EULA"

24  acronym.  (*Id.*)  Nor is there any indication that by continuing to play the game, the child is

25  agreeing to any terms of service or end user license agreement that she neither saw nor assented

26  to.  (*Id.*)  There is no explanation for what "EULA" means, nor any indication of game play

27  being conditioned on its acceptance.  (*Id.*)  If a child were to click on the "EULA" link, she would

28  then be presented with Viacom's end user license agreement, in which she could find an

PLAINTIFFS' OPPOSITION TO THE VIACOM
DEFENDANTS' MOTION TO COMPEL ARBITRATION
3:17-CV-04492-JD

1   arbitration provision only after scrolling to paragraph 14 of the document. (Pollock Decl. ¶¶ 14-

2   19.)  It is this arbitration provision that Viacom alleges covers this dispute.

3   **III.    ARGUMENT**

4          Plaintiffs did not agree to arbitrate their claims, nor did they agree to any of the terms in

5   Viacom's EULA.  Viacom's browsewrap agreement did not put Plaintiffs on sufficient notice of

6   its terms, nor did it solicit or obtain Plaintiffs' assent.  Therefore, no valid contract was formed

7   and the arbitration agreement is unenforceable.

8          **A.    Arbitration is a matter of contract, and no contract was entered into by the
             parties.**

9

10         The U.S. Supreme Court has repeatedly explained that "arbitration is a matter of

11   contract." *Concepcion*, 131 S. Ct. at 1745 (internal quotation marks and citation omitted).  In

12   determining whether a valid arbitration agreement exists, federal courts "apply ordinary state-law

13   principles that govern the formation of contracts." *First Options of Chic., Inc. v. Kaplan*, 514

14   U.S. 938, 944 (1995).  Viacom, "as the party seeking to compel arbitration, has the burden of

15   proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Mitchell*

16   *v. U-Haul Co. of Cal.*, No. 16-cv-04674-JD, 2017 U.S. Dist. LEXIS 79064, at *1 (N.D. Cal. May

17   23, 2017) (Donato, J.) (citing *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir.

18   2014)).  The Federal Arbitration Act ("FAA"), therefore, is not relevant to the threshold issue of

19   whether the parties entered into an agreement to arbitrate.  *See, e.g.*, *Concepcion*, 131 S. Ct. at

20   355 (The FAA "would require enforcement of an agreement to arbitrate *unless* a party

21   successfully asserts a defense concerning the formation of the agreement to arbitrate . . . .")

22   (Thomas, J., concurring) (emphasis added).  "[T]he FAA does not confer a right to compel

23   arbitration of any dispute at any time; it confers only the right to obtain an order directing that

24   arbitration proceed *in the manner provided for in [the parties'] agreement*." *Volt Info. Scis., Inc.*

25   *v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 474–75 (1989) (internal quotation

26   marks omitted) (alteration in original).  "[A] party cannot be required to submit to arbitration any

27   dispute which he has not agreed so to submit." *In re Henson*, 869 F.3d 1052, 1059 (9th Cir.

28   2017) (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)).

1   Further, in establishing the very existence of an agreement to arbitrate, "there is no thumb

2   on the scale in favor of finding an arbitration agreement to exist." *Norcia v. Samsung Telecomms.*

3   *Am., LLC*, No. 14-cv-00582-JD, 2014 WL 4652332, at, *4 (N.D. Cal. Sep. 18, 2014) (Donato, J.),

4   *affirmed, Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279 (9th Cir. 2017).  "[T]he

5   'liberal federal policy regarding the scope of arbitrable issues is inapposite' when the question is

6   'whether a particular party is bound by the arbitration agreement.'" *Id.* (quoting *Comer v. Micor,*

7   *Inc.*, 436 F.3d 1098, 1104 n.11 (9th Cir. 2006)).

8   **B.    California contract law applies to the analysis of Viacom's EULA.**

9   California contract law governs this dispute.  "Federal courts sitting in diversity look to

10  the law of the forum state when making choice of law determinations." *Hoffman v. Citibank*

11  *(South Dakota), N.A*., 546 F.3d 1078, 1082 (9th Cir. 2008).  Under California's choice-of-law

12  analysis, New York law would apply only upon Viacom's showing, among other things, that New

13  York law "materially differs from the law of California." *Washington Mut. Bank, FA v. Super.*

14  *Ct.*, 24 Cal. 4th 906, 911 (Cal. 2001).  Absent such a showing, California law is applied.  *Id.*

15  Viacom concedes that "the contract formation principles addressed here are generally accepted

16  regardless of jurisdiction."  (Mot. at 8, n. 8.)

17  Further, because Viacom's EULA is unenforceable, its choice-of-law provision is void.

18  "[W]hether the choice of law provision applies depends on whether the parties agreed to be bound

19  by [the defendant's] Terms of Use in the first place." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d

20  1171, 1175 (9th Cir. 2014); *In re Henson*, 869 F.3d at 1059 ("A choice-of-law clause, like an

21  arbitration clause, is a contractual right and generally may not be invoked by one who is not a

22  party to the contract in which it appears.") (quoting *Paracor Fin., Inc. v. Gen. Elec. Capital*

23  *Corp*., 96 F.3d 1151, 1165 (9th Cir. 1996)).

24  **C.    A browsewrap agreement is enforceable only when it is conspicuous and the user is on notice that continued use connotes acceptance of the terms.**

25

26  Under California law, "[m]utual manifestation of assent, whether by written or spoken

27  word or by conduct, is the touchstone of contract," and without sufficient indicia of assent by any

28  of the parties, no contract is formed. *Nguyen*, 763 F.3d at 1175 (quoting *Specht v. Netscape*

1   *Commc'ns Corp.*, 306 F.3d 17, 29 (2d Cir. 2002) (applying California law)).  "An agreement

2   requires mutual assent, generally achieved through an offer and acceptance. An offer that no

3   reasonable person would recognize as a proposal…does not count."  *Norcia*, 2014 WL 4652332,

4   at *8 (citation omitted).  It follows that "an offeree, …is not bound by inconspicuous contractual

5   provisions of which he was unaware, contained in a document whose contractual nature is not

6   obvious."  *Windsor Mills, Inc. v. Collins & Aikman Corp*., 25 Cal. App. 3d 987, 993 (1972).

7        Viacom's EULA is an unenforceable browsewrap agreement.  "Browsewrap" agreements

8   often contain the website's or app's terms and conditions, but do not require that users take any

9   affirmative action to assent to those terms.  *Nguyen*, 763 F.3d at 1776.  Browsewrap agreements

10  stand apart from the other major type of Internet contract – "clickwrap" agreements – which

11  require the visitor to check a box or perform some other, explicit and recordable action indicating

12  agreement to be bound by the terms.  *Id.*  Because browsewrap agreements provide "no evidence

13  that the website user had actual knowledge of the agreement, [their] validity…turns on whether

14  the website puts a reasonably prudent user on inquiry notice of the terms of the contract."  *Id.* at

15  1177 (citing *Specht*, 306 F.3d at 30-31).  Viacom fails to do this with its EULA.

16        In *Nguyen v. Barnes & Noble Inc.*, the Ninth Court established a three-part test for

17  determining a browsewrap agreement's enforceability.  *Nguyen* requires: (1) conspicuously-

18  placed, hyperlinked terms of use; (2) "other notices given to users" that direct their attention to

19  the terms of use hyperlink;[5] and (3) the court take into account "the website's general design . . ."

20  *Nguyen*, 763 F.3d at 1177.  In *Nguyen*, the Court considered a hyperlink clearly labeled "Terms of

21  Use," which was presented in an underlined, green typeface on the bottom left-hand corner of

22  every page on Barnes & Noble's website, including the online checkout page.  *Id.* at 1174.  The

23  Court concluded that even the conspicuous presence of the "Terms of Use" hyperlink on *every*

24  page of the website could not overcome "courts' traditional reluctance to enforce browsewrap

25  agreements against individual consumers. . . . "  *Id.* at 1178.  "[W]here a website makes its terms

26  _____

27  [5] An example cited by the Court as sufficient "other notice" is a textual notice stating: "By
    continuing past this page and/or using this site, you agree to abide by the Terms of Use for this
    site."  *Cairo, Inc. v. Crossmedia Servs., Inc.*, No. 04–04825, 2005 WL 756610, at *2, *4–5 (N.D.

28  Cal. Apr. 1, 2005).

1  of use available via a conspicuous hyperlink on every page of the website but otherwise provides

2  no notice to users nor prompts them to take any affirmative action to demonstrate assent, even

3  close proximity of the hyperlink to relevant buttons users must click on – without more – is

4  insufficient to give rise to constructive notice." *Id.* at 1178-79.

5      Subsequently, courts have consistently applied *Nguyen* and its progeny to hold

6  browsewrap agreements unenforceable when the only "notice" provided to a user is a hyperlink

7  on the website.  *See, e.g.*, *McKee v. Audible, Inc.*, No. CV 17-1941-GW(Ex), 2017 WL 4685039,

8  at *8 (C.D. Cal. July 17, 2017) (despite presence of a hyperlink to terms of service, "a reasonable

9  consumer would not be put on notice that the disclosure below the 'Start Now' button actually

10  attached any contractual consequences to clicking *that particular button* to begin a free

11  membership, much less an arbitration agreement contained in an agreement titled 'Terms of

12  Use.'"); *Mitchell*, 2017 U.S. Dist. LEXIS 79064, at *3 (applying *Nguyen* and holding arbitration

13  agreement to be unenforceable where link to contract's terms is buried in an email, with no

14  textual cue to alert the reader to the existence of the link); *Doe v. Xytex Corp.*, No. C 16-02935

15  WHA, 2016 WL 3902577, at *4  (N.D. Cal. July 19, 2016) ("[W]ithout notifying consumers that

16  the linked page contains binding contractual terms, the phrase 'terms of use' may have no

17  meaning or a different meaning to a large segment of the Internet-using public. In other words, a

18  conspicuous 'terms of use' hyperlink may not be enough to alert a reasonably prudent Internet

19  consumer to click the hyperlink.") (quoting *Long v. Provide Commerce, Inc.*, 245 Cal. App. 4th

20  855, 867 (2016)); *Opperman v. Path, Inc.*, 205 F. Supp. 3d 1064, 1073-74 (N.D. Cal. 2016)

21  ("hyperlinked, off-screen terms in the Privacy Policies," with no further notice, did not "provide[]

22  users with constructive notice such that they could effectively consent to anything contained off-

23  screen.").

24      **D.**   **Users are not put on notice of Viacom's EULA when downloading *Llama Spit***

25      ***Spit*.**

26      No enforceable agreement was formed between Viacom and Plaintiffs, either in the course

27  of downloading *Llama Spit Spit* or in the course of playing the app.  In each instance, Viacom

28  flunked the first two prongs of *Nguyen*'s test, failing to provide *either* a conspicuously-placed

1    hyperlink or an additional, textual notice alerting Plaintiffs to the existence of its EULA.

2                    **1.      Viacom's EULA is inconspicuous and unavailable during the**
3                    **download process.**

4          Viacom first argues that Plaintiffs had constructive notice of the EULA in the course of

5    downloading *Llama Spit Spit*.  (Mot. at 9.)  Yet, Viacom fails to put a reasonable user on notice of

6    its EULA because there is *no* reference – much less a conspicuous reference – to the EULA on

7    the download webpage in the Apple App Store.  (Addendum, Fig. 1; Ortiz Decl. ¶ 13, Fig. 3.)  To

8    the contrary, this is an instance of paradigmatically non-conspicuous placement.  To find any

9    reference to the EULA, a user would have to click the "more" link beneath a marketing blurb

10   about the app, at which point several additional, heretofore-hidden paragraphs of text are

11   revealed.  Even if one *were* to click the link, and continue reading, it would only be after

12   additional marketing representations and a separate paragraph of boilerplate legal language that

13   one would find a reference to the EULA.  (Addendum, Fig. 2; Ortiz Decl. ¶ 13, Fig. 4.)

14   Further, although the EULA is referenced, *it cannot be accessed or read because Viacom has not*

15   *provided a usable hyperlink*.  (Pollock Decl. ¶¶ 6-8.)  Instead, the URL for the EULA is static text

16   that cannot be clicked on or even copied and pasted.  (*Id.*)  Thus, in order to access and read the

17   EULA, the user must: (1) terminate the download process, (2) transcribe the URL, (3) leave the

18   Apple App Store, (4) open a separate browser, and (5) manually type in the URL.

19         Such an arduous process patently fails the constructive notice requirement.  *See McKee*,

20   2017 WL 4685039, at *8 (No conspicuousness of terms where "the initial disclosure is not

21   hyperlinked and appears in small, undifferentiated font.").  The circumstances here are far from

22   the conspicuously-placed "Terms & Conditions" hyperlink contemplated in *Nyugen*, which itself

23   was set-off by different-colored font on every webpage.  763 F.3d at 1174.  Even then, the Court

24   deemed the browsewrap agreement insufficient to provide users constructive notice.  *Id.* at 1179.

25   Put more plainly:  the EULA is hidden and, ultimately, inaccessible.  Courts routinely hold that

26   such links fail to create enforceable contracts.  *See Norcia*, 2014 WL 4652332, at *9 (product web

27   page with hyperlink to contract language at issue was "an additional step removed from the actual

28   [contract] language" and therefore too attenuated to provide inquiry notice.); *Mitchell*, 2017 U.S.

1    Dist. LEXIS 79064, at *2-3 (link "'buried' at the bottom of [an] email where recipients are

2    unlikely to see it" does not create an enforceable browsewrap agreement); *Xytex*, 2016 WL

3    3902577, at *3 ("Indeed, Xytex placed the link to its site-usage agreement *even more*

4    *inconspicuously* than the defendant in *Nguyen* had, inasmuch as the link on xytex.com could only

5    be accessed *after* a user pulled down an additional menu, which menu itself had no indication of

6    the nature of the contract hidden within.").

7        Without a conspicuously-placed, conspicuously-labeled, functioning hyperlink in the

8    download process of *Llama Spit Spit*, Viacom fails to satisfy the threshold requirement of *Nguyen*

9    and thus failed to form an enforceable browsewrap agreement.

10           **2.**     **Viacom does not provide users with sufficient, further notice of its**

11   **EULA during download.**

12       In addition to Viacom's EULA being inconspicuous and unavailable, nothing in the *Llama*

13   *Spit Spit* download process provides users *further* notice of the EULA or otherwise indicates to

14   users that, by taking any additional action such as continuing to download the game, they agree to

15   the EULA.  This is an *additional* failure of the browsewrap test:  for a browsewrap agreement to

16   be enforceable, there must be "something more to capture the user's attention and secure her

17   assent" than a mere hyperlink.  *Nyugen*, 763 F.3d at 1178 n.1.  Examples provided by the Ninth

18   Circuit include (1) "[a] final screen on [a] website contain[ing] the phrase 'Review terms,'" or (2)

19   a textual notice on every page of the website stating: "By continuing past this page and/or using

20   this site, you agree to abide by the Terms of Use for this site, which prohibit commercial use of

21   any information on this site."  *Id.* at 1177-78 (internal quotation marks and citations omitted).

22       Viacom does not provide any similar indicia of notice for *Llama Spit Spit*.  (Mot. at 9;

23   Ortiz Decl. ¶¶ 12-13.)  Absent such additional notice, there is no assent to be bound by Viacom's

24   EULA.  *Nyugen*, 763 F.3d at 1178-79; *McKee*, 2017 WL 4685039, at *8 (despite presence of a

25   hyperlink to terms of service, "a reasonable consumer would not be put on notice that the

26   disclosure below the 'Start Now' button actually attached any contractual consequences to

27   clicking that particular button … , much less an arbitration agreement contained in an agreement

28   titled 'Terms of Use.'"); *Opperman*, 205 F. Supp. 3d at 1073-74 ("hyperlinked, off-screen terms

1   in the Privacy Policies," with no further notice, did not "provide[] users with constructive notice

2   such that they could  effectively consent to anything contained off-screen."); *Xytex*, 2016 WL

3   3902577, at *4 ("[W]ithout notifying consumers that the linked page contains binding contractual

4   terms, the phrase 'terms of use' may have no meaning or a different meaning to a large segment

5   of the Internet-using public. In other words, a conspicuous 'terms of use' hyperlink may not be

6   enough to alert a reasonably prudent Internet consumer to click the hyperlink.") (quoting *Long*,

7   245 Cal. App. 4th at 867).

8        The download process for *Llama Spit Spit* did not provide Plaintiffs with a conspicuously-

9   placed (or even functioning) hyperlink to Viacom's EULA, nor was there any additional, textual

10  notification directing their attention to the EULA or the consequences of downloading the app, as

11  required by *Nguyen* and its progeny.  Accordingly, Viacom cannot demonstrate Plaintiffs' assent

12  to be bound to the terms of its EULA or the arbitration clause contained therein.

**E.     *Llama Spit Spit*  users were not put on notice of Viacom's EULA while playing the app.**

**1.     Viacom's EULA is inconspicuous to children playing the app.**

16       Viacom mistakenly contends that once *Llama Spit Spit* was downloaded, Plaintiff L.L.'s

17  act of playing the game provided her constructive notice of the EULA's existence which, in turn,

18  would obtain her assent to be bound by the arbitration agreement contained therein.  (Mot. at 9-

19  10.)  Viacom rests its argument exclusively on the presence of the words "Privacy Policy" in the

20  bottom, far-left corner of the screen.  (*Id.*; *see also* Addendum, Fig. 3; Ortiz Decl. ¶ 17, fig. 6.)

21  However, clicking the "Privacy Policy" link presents the child user with a box containing four

22  new hyperlinks, one of which reads simply "EULA" with no explanation;[6] only by clicking

23  "EULA" would the child be shown the end user license agreement.  (Addendum, Fig. 4; Ortiz

24  Decl. ¶ 17, fig. 7.)  Viacom does not claim – nor could it – that a child would be *prevented from*

25  playing the app absent expressing notice of and assent to the EULA.  Indeed, the app launches

26  and play begins without any notice of any governing terms, let alone an arbitration agreement.

_____

[6] The three other options are Privacy Policy, Summary of Changes, and Arbitration FAQ.  (*See*
Addendum Fig. 4; Ortiz Declaration, ¶ 17, Figure 7.)

1    Courts consistently decline to enforce broweswrap agreements under far less confusing

2    circumstances.  Simply placing a "Privacy Policy" link on the homepage – without a link

3    referencing a "terms of service," "end user license agreement," or some other terminology

4    denoting the availability of a contractual agreement for review – does not meet the "clear and

5    conspicuous placement" standard.  *Nguyen*, 763 F.3d at 1177 (courts will not "enforce [an]

6    arbitration clause in browsewrap agreement that was only noticeable after a 'multi-step process'

7    of clicking through non-obvious links.") (citing *Van Tassell v. United Mktg. Grp., Ltd. Liab. Co*.,

8    795 F. Supp. 2d 770, 792-93 (N.D. Ill. 2011)); *Norcia*, 2014 WL 4652332, at *9 (web page with

9    hyperlink to contract language at issue was "an additional step removed from the actual [contract]

10   language" and therefore too attenuated to provide inquiry notice.); *Xytex*, 2016 WL 3902577, at

11   *3 (no conspicuous placement where the link to terms "could only be accessed *after* a user pulled

12   down an additional menu, which menu itself had no indication of the nature of the contract hidden

13   within.").

14   Second, the acronym "EULA" fails to provide a user with notice of Viacom's putative

15   arbitration agreement.  A child who clicks on the Privacy Policy link, is faced with four additional

16   links that subsequently appear and, seeing "EULA" among them, is given no indication – let

17   alone the requisite notice – that a contractual agreement is available for review.  Indeed, courts

18   decline to find constructive notice to a website's terms and conditions where, as here, the

19   hyperlink thereto is not suitably explicit.  *Xytex*, 2016 WL 3902577, at *3 ("[A] consumer is even

20   less likely to understand the contractual nature of a page concerning 'Site Usage' than one

21   concerning 'Terms of Use.'"); *McKee*, 2017 WL 4685039, at *8 ("[E]ven were a consumer to

22   understand that selecting the 'Start Now' button bound that user to Audible's Conditions of Use,

23   that consumer would also need to surmise that Audible really meant the document titled 'Terms

24   of Use' that appears on the following page.").

25   Because there is no conspicuously-placed link to binding terms and conditions on the

26   homepage of *Llama Spit Spit*, and because the inconspicuous link is misleadingly labeled at *two*

27   *stages*, Plaintiffs were not put on constructive notice of Viacom's browsewrap agreement in the

28   course of playing *Llama Spit Spit*.  *Nguyen*, 763 F.3d at 1177.  Accordingly, Viacom's EULA is

1  unenforceable and Viacom may not compel arbitration of Plaintiffs' claims.

2      **2.**  <u>**Viacom does not provide users with sufficient, further notice of its**</u>
       <u>**EULA while playing the app.**</u>

3

4     When children play *Llama Spit Spit*, they are not provided with any *further* notice of

5  Viacom's EULA or otherwise informed that, by continuing to play, they will be agreeing to the

6  EULA.  To the contrary, the game is designed so that it immediately begins when the app is

7  opened.  (Pollock Decl. ¶¶ 11-13.)  The absence of any additional notice directing the user's

8  attention to the significance of Viacom's EULA or alerting the user that continued play connotes

9  acceptance of the terms of the EULA provides an additional and independent basis for finding the

10 EULA unenforceable.  *See Nguyen*, 763 F.3d at 1178 n.1; Section III.D.2, *supra*.

11    **F.**  <u>**Viacom's cases address websites with conspicuous hyperlinks and additional**</u>
     <u>**textual notices, and therefore do not support its Motion.**</u>

12

13    All of the cases cited by Viacom in its Motion are easily distinguished on their facts, as

14 the browsewrap agreements at issue were: (1) presented via hyperlinks that were conspicuously-

15 placed on the defendant's website,[7] and (2) contained additional, textual notices alerting the

16 website visitor to the existence of the terms of service at issue.[8]  Indeed, in some instances,

17 _____

18 [7] *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017) (conspicuous hyperlink where "[t]he entire screen is visible at once, and the user does not need to scroll beyond what is immediately visible to find notice of the Terms of Service."); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393,

19 402 (2d Cir. 2004) (Verio, the party arguing against formation of Browsewrap agreement "visited Register's computers daily…and each day saw the terms of Register's offer; Verio admitted that,

20 in entering Register's computers to get the data, it was fully aware of the terms on which Register offered the access."); *DeVries v. Experian Info. Sols., Inc.*, No. 16-cv-02953-WHO, 2017 U.S.

21 Dist. LEXIS 26471, at *14-15 (N.D. Cal. Feb. 24, 2017) ("The text containing the Terms and Conditions hyperlink was located directly above that button and indicated that clicking 'Submit

22 Secure Purchase' constituted acceptance of those terms."); *Nevarez v. Forty Niners Football Co.*, No. 16-CV-07013, 2017 WL 3492110, at *8 (N.D. Cal. Aug. 15, 2017) (Conspicuous placement

23 where the "Ticketmaster Website's Terms of Use…were always hyperlinked and available for review.") (quotation omitted).

24 [8] *Register.com*, 356 F.3d at 396 (visitors to the Register.com website would receive textual notice of agreement to be bound, beginning with the phrase "By submitting a WHOIS query, you agree

25 that …" and followed by explicit terms of agreement); *Meyer*, 868 F.3d at 76 ("By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY"); *Nevarez*, WL

26 3492110, at *8 ("Plaintiffs were explicitly told that by clicking 'Submit Order' they were agreeing to the Ticketmaster Website's Purchase Policy, which further informed Plaintiffs in the

27 first paragraph that their use of the Ticketmaster Website was governed by the Ticketmaster Website's TOU."); *DeVries*, 2017 U.S. Dist. LEXIS 26471, at *14-15 ("The text containing the

28 Terms and Conditions hyperlink was located directly above that button and indicated that clicking

Viacom's own authority *rejected* a defendant's formation argument because one of these requirement was missing.[9]  As discussed above, neither of these essential criteria are satisfied in *Llama Spit Spit* and, accordingly, Plaintiffs did not agree to be bound by Viacom's EULA.

**G.      Plaintiffs did not assent to Viacom's EULA.**

Viacom's specious claim that the Complaint infers that Plaintiffs were on actual notice of Viacom's EULA should be rejected.  (Mot. at 10-11.)  While failing to articulate a specific legal theory, Viacom argues that Plaintiffs should be forced into arbitration on equitable estoppel grounds.  (*Id*.)  That the Complaint cites content from the Apple App Store does not equate to Plaintiffs' "awareness of language found in the same portion of the app description that discusses the EULA and its arbitration provision" sufficient to manifest Plaintiffs' assent to Viacom's EULA.  (Mot. at 11.)  This precise argument was expressly rejected by the Ninth Circuit in *Nguyen*.  There, the plaintiff attempted to enforce the New York choice-of-law provision while disputing the arbitration provision in the very same terms of service.  763 F.3d at 1179-80.  First, the Court noted that "[e]quitable estoppel typically applies to third parties who benefit from an agreement made between two primary parties," and that when analyzing the enforceability of a browsewrap agreement, the plaintiff "is not a third-party beneficiary to [the] Terms of Use, and whether he is a primary party to the Terms of Use lies at the heart of this dispute."  *Id*.  Second, application of the equitable estoppel doctrine requires that the party avoiding the arbitration provision also seek a "direct benefit" from the contract containing said provision.  *Id*. at 1180.  Plaintiffs here seek no benefit under Viacom's EULA.  Indeed, the Complaint makes no reference to the EULA *at all*.  Instead, Plaintiffs cite to Viacom's own description of *Llama Spit Spit*, posted in the App Store,[10] and nothing more.  A description of Viacom's marketing representations on the Apple App Store cannot credibly be said to evidence Plaintiffs' notice of Viacom's EULA so as to manifest consent to the EULA's arbitration provision.  *Id*.

---

'Submit Secure Purchase' constituted acceptance of those terms.")

[9] *See, e.g.*, Mot. at 8 (citing *Nguyen*, 763 F.3d).

[10] Specifically, "The Spit is on! Defeat hipster enemies as you collect coins, power-ups and crazy llama costumes, Lllama-tastic (sic) scores can land you on the leaderboard, so what are you waiting for? Get spitting!"  (Compl. ¶ 43.)

1

2

**H.**    **There are no threshold questions for an arbitrator because there is no agreement to arbitrate.**

3    Viacom improperly asks the Court to delegate threshold determinations of "the scope of

4  the arbitration agreement" to the arbitrator.  (Mot. at 11.)  Such a request misstates the relevant

5  inquiry, the instant facts, and the applicable law.  No agreement was ever formed.  Arbitration is a

6  contractual matter, and "arbitrators derive their authority to resolve disputes only because the

7  parties have agreed in advance to submit such grievances to arbitration."  *Int'l Longshore  v.*

8  *Columbia Grain, Inc.*, No. 15-35620, 2017 WL 4816767, at *1  (9th Cir. Oct. 25, 2017) (quoting

9  *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 296 (2010)).  It is "well settled

10  that where the dispute at issue concerns contract formation, the dispute is generally for courts to

11  decide[,]" not the arbitrator.  *Granite Rock*, 561 U.S. at 296; *Burgoon v. Narconon of N. Cal*., 125

12  F. Supp. 3d 974, 983 (N.D. Cal. 2015) (the issue of contract formation is "the Court's duty, and

13  not the arbitrator's . . . .").

14    Plaintiffs' position – that they did not assent to be bound by Viacom's EULA – "is plainly

15  a challenge to the *existence* of a binding contract, not to a contract's continued *validity*" as to their

16  claims.  *Kum Tat Ltd. v. Linden Ox Pasture, LLC*, No. 14-cv-02857-WHO, 2014 WL 6882421, at

17  *5 (N.D. Cal. Dec. 5, 2014) (emphasis added).  Plaintiffs raise "questions regarding contract

18  formation, not contract enforcement[,]" and accordingly they must be resolved by the Court, not

19  an arbitrator.  *Id.*

20  **IV.**    **CONCLUSION**

21    For the foregoing reasons, Plaintiffs did not enter into an agreement to arbitrate this

22  dispute with Viacom, and Viacom's Motion should be denied.

23

24

25

26

27

28

1

2   Dated: December 22, 2017                    Respectfully Submitted,

3   _____

4                                               Michael W. Sobol (State Bar No. 194857)
                                                msobol@lchb.com
                                                LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
5                                               275 Battery Street, 29th Floor
                                                San Francisco, CA  94111-3339
6                                               Telephone:  415.956.1000
                                                Facsimile:  415.956.1008
7

8                                               Nicholas Diamand
                                                ndiamand@lchb.com
                                                Douglas I. Cuthbertson
9                                               dcuthbertson@lchb.com
                                                Abbye R. Klamann (State Bar No. 311112)
10                                              aklamann@lchb.com
                                                LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
11                                              250 Hudson Street, 8th Floor
                                                New York, NY  10013-1413
12                                              Telephone:  212.355.9500
                                                Facsimile:  212.355.9592
13

14                                              Hank Bates (State Bar No. 167688)
                                                hbates@cbplaw.com
                                                Allen Carney
15                                              acarney@cbplaw.com
                                                David Slade
16                                              dslade@cbplaw.com
                                                CARNEY BATES & PULLIAM, PLLC
17                                              519 W. 7th St.
                                                Little Rock, AR 72201
18                                              Telephone:  501.312.8500
                                                Facsimile:  501.312.8505
19

20                                              *Attorneys for Plaintiffs and the Proposed Classes*

21

22

23

24

25

26

27

28

1

## ADDENDUM

2

Figure 1

3

(Ortiz Declaration, ¶ 13, Figure 3)

4

5

6

7

8

9

10

11

12

13

14

15

16

17



18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Figure 2

(Ortiz Declaration, ¶ 13, Figure 4)

PLAINTIFFS' OPPOSITION TO THE VIACOM
DEFENDANTS' MOTION TO COMPEL ARBITRATION
3:17-CV-04492-JD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Figure 3

(Ortiz Declaration, ¶ 17, Figure 6)



PLAINTIFFS' OPPOSITION TO THE VIACOM
DEFENDANTS' MOTION TO COMPEL ARBITRATION
3:17-CV-04492-JD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Figure 4

(Ortiz Declaration, ¶ 17, Figure 7)

